## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO**. _____**

| | |
|---|---|
| EVAN POSSICK, Individually and on Behalf of All Others Similarly Situated, | **(JURY TRIAL DEMANDED)** |
| Plaintiff, | |
| vs. | |
| DYCOM INDUSTRIES, INC., STEVEN E. NIELSEN and ANDREW DEFERRARI, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Evan Possick ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Dycom Industries, Inc. ("Dycom" or the "Company"),, analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Dycom common stock between November 20, 2017, and August 10, 2018, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act") , and SEC Rule 10b-5 promulgated thereunder.

2.      Dycom provides specialty contracting services through subsidiaries throughout the United States and in Canada. Dycom's services include program management, engineering, construction, maintenance, and installation services for telecommunications providers, underground facility locating services for various utilities, including telecommunications providers, and other construction and maintenance services for electric and gas utilities.

3.      Dycom's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DY".

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company was highly dependent on permitting and tactical considerations for its large projects; (ii) the Company's permitting for its large projects was uncertain; (iii) as a result, the Company was exposed to near-term margin pressure and absorption issues; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On May 22, 2018, the Company disclosed, among other things, that the Company was facing margin pressure caused by the under-absorption of labor and field costs as large customer programs mobilized. It was further disclosed that the Company expected "margins to continue to be impacted in the near term with the pressure dissipating as we gain greater

momentum on these large programs." Following these disclosures, the Company lowered its outlook for the full fiscal year of 2018.

6.      On this news, the price of the Company's common stock declined $23.56 from a close on May 21, 2018 at $116.20 per share, to close at $92.64 per share on May 22, 2018, a decline of approximately 20.27%.

7.      Then, on August 13, 2018, Dycom again announced disappointing results for the quarter ended July 28, 2018, and announced it would revise its financial guidance for fiscal year 2019. Specifically, it was revealed that Dycom's "results were impacted by large scale deployments that were slower than expected during the quarter, due to customer timing and tactical considerations and margins that were pressured from under-absorption of labor and field costs to the lower revenue level.

8.      Following this news, shares of Dycom declined more than 24% to close at $68.09 per share on August 13, 2018.

## JURISDICTION AND VENUE

9.      The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.).

11.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Dycom maintains its principal executive offices in this Judicial District.

## **PARTIES**

12.    Plaintiff purchased Dycom common stock within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing her transactions is attached hereto as Exhibit A.

13.    Defendant Dycom is incorporated in Florida and maintains its principal offices located at 11780 US Highway 1, Suite 600, Palm Beach Gardens, FL 33408. Dycom's common stock trades on the NYSE under the ticker symbol "DY."

14.    Defendant Steven E. Nielsen ("Nielsen") was the Company's Chief Executive Officer ("CEO") and President at all relevant times.

15.    Defendant Andrew DeFerrari ("DeFerrari") was the Company's Chief Financial Officer ("CFO") and Senior Vice President at all relevant times.

16.    The Defendants referenced above in ¶¶ 14-15 are sometimes referred to herein collectively as the "Individual Defendants."

17.    The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

4

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Dycom provides specialty contracting services through subsidiaries throughout the United States and in Canada. Dycom's services include program management, engineering, construction, maintenance, and installation services for telecommunications providers, underground facility locating services for various utilities, including telecommunications providers, and other construction and maintenance services for electric and gas utilities.

### Material Misstatements and Omissions during the Class Period

19.     The Class Period begins on November 20, 2017, when Dycom issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the Company's financial and operating results for the first fiscal quarter ended October 28, 2017 ("Q1 2018 Press Release"). The  Q1 2018 Press Release stated, in relevant part:

Palm Beach Gardens, Florida, November 20, 2017 - Dycom Industries, Inc. (NYSE: DY) announced today its results for the fiscal quarter ended October 28, 2017. This announcement is one day earlier than previously scheduled and the conference call to review the Company's results is now scheduled for Monday, November 20, 2017 at 9:00 a.m. (ET). Specific dial-in and replay information appears below.

The schedule change is a result of the Company's preliminary determination that certain documents containing financial information were subject to unauthorized access after the market closed on Friday, November 17, 2017. The Company's investigation is ongoing and law enforcement authorities have been notified.

•      Contract revenues of $756.2 million for the quarter ended October 28, 2017, compared to $799.2 million for the quarter ended October 29, 2016. Contract revenues for the quarter ended October 28, 2017 decreased 8.4% on an organic basis after excluding $8.6 million of contract revenues from an acquired business that was not owned during the prior year quarter and $15.5 million of contract revenues from storm restoration services in the current period.

•      Non-GAAP Adjusted EBITDA of $97.6 million, or 12.9% of contract revenues, for the quarter ended October 28, 2017, compared to $129.2 million, or 16.2% of contract revenues, for the quarter ended October 29, 2016.

• On a GAAP basis, net income was $28.8 million, or $0.90 per common share diluted, for the quarter ended October 28, 2017, compared to net income of $51.0 million, or $1.59 per common share diluted, for the quarter ended October 29, 2016. Non-GAAP Adjusted Net Income was $31.6 million, or $0.99 per common share diluted, for the quarter ended October 28, 2017, compared to Non-GAAP Adjusted Net Income of $53.7 million, or $1.67 per common share diluted, for the quarter ended October 29, 2016. Non-GAAP Adjusted Net Income for the quarters ended October 28, 2017 and October 29, 2016 excludes $4.5 million and $4.3 million, respectively, of pre-tax interest expense incurred for non-cash amortization of the debt discount associated with the Company's 0.75% convertible senior notes due September 2021.

Net income and Non-GAAP Adjusted Net Income for the quarter ended October 28, 2017 include an income tax benefit of approximately $0.9 million for the tax effects of certain share-based award activities as a result of the Company's adoption of Accounting Standards Update No. 2016-09, Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting ("ASU 2016-09"). This tax benefit would have been recorded to additional paid-in-capital under the previous accounting standard.

The Company also announced its outlook for the fiscal quarter ending January 27, 2018. The Company currently expects total contract revenues for the fiscal quarter ending January 27, 2018 to range from $645 million to $675 million. On a GAAP basis, diluted earnings per common share for the fiscal quarter ending January 27, 2018 is expected to range from $0.15 to $0.27. Non-GAAP Adjusted Diluted Earnings per Common Share is expected to range from $0.24 to $0.36. Non-GAAP Adjusted Diluted Earnings per Common Share guidance excludes $4.6 million of pre-tax interest expense for non-cash amortization of debt discount, or $0.09 per common share diluted on an after-tax basis. A reconciliation of Non-GAAP Adjusted Diluted Earnings per Common Share guidance provided for the fiscal quarter ending January 27, 2018, along with reconciliations of other Non-GAAP measures, is included within the press release tables.

20. The Company held a conference call to discuss its financial and operating results for the first fiscal quarter ended October 28, 2017, during which Defendant Nielsen stated in relevant part that "[e]ngineering and construction activity is expected to increase throughout the balance of our second quarter and accelerate into calendar 2018. Customers are continuing to reveal with specificity new multi-year initiatives that are being planned and managed on a market-by-market basis." Defendant Nielsen further stated that "[a]s with prior initiations of large-scale

network deployments, we expect some normal timing volatility and customer spending modulations as network deployment strategies evolve and tactical considerations, primarily permitting impact timing."

21.    Later on the conference call, an analyst question Defendant Nielsen regarding the timing and the permitting necessary for the Company to operate at its larger projects. Defendant Nielsen quelled the analyst's concerns:[1]

> **Stifel, Nicolaus & Company, Incorporated:**
> Okay great, thanks. And then second, you've mentioned some permitting hold ups, is this just a function of the scale of some of these capital plans that your customers **-- or is there something else specific going on?**
>
> **Nielsen**:
> No. It's exactly your point, Noelle, is that when you show up at a number of cities and you come with large programs, it always takes the permitting authorities a little bit of time to gear up and we're working aggressively with our customers to help them gear up. ***It is not anything unusual, and unlike other adjacent spaces where you have larger projects, these are typically local municipal permits, they're not federal permits. We're not talking about environmental studies or other types of permitting.*** And, in fact, just recently, the FCC passed a rule that actually will speed around small cells, some of the permitting by removing some local reviews that were already occurring. So I think it'll get better, it always does. But at this stage in these projects, it's always something to watch.

22.    Additionally, Defendant Nielsen also disclosed on the call an increase in headcount from 13,236 for the fiscal quarter ended January 28, 2017 to 14,393. During the call, an analyst inquired about the reasons for said increase, to which Defendant Nielsen responded, in relevant part:

> **Wells Fargo Securities, LLC:**
> Two, if I may. Just on the, excuse me, employee count, it did go up a bit, which seems surprising. I mean, I assume that's just part of the absorption comments that you feel very comfortable hiring more heads, given the line of sight you see coming down the pike. I just wanted to confirm that.

*      *      *

---

[1] Emphasis added throughout, unless otherwise noted.

**Nielsen:**
Sure. So with respect to the employee count, as we've talked about on the last call, we certainly are adding engineers, planners, designers, project managers. We're setting up warehouse locations to support these new project initiations. And the core business, is busy. I mean you look at the housing numbers, there are other things that are driving that headcount, but we're getting ready. Well, we're not getting ready, we're doing the engineering work we need to get started.

23.    Defendant DeFerrari discussed on the call the impact of the new large projects on

the gross margin, stating, in relevant part:

We expect gross margin ***percentage*** to be in line or slightly better compared to the April 2017 quarterly margin, reflecting the expected mix of work activity and improving performance as services for large customer programs begin to accelerate.

24.    During the Q&A session of the call, Defendant Nielsen in relevant part:

**Thompson, Davis & Company, Inc.:**
Steve, I wanted to stay with the April guidance. You've guided to gross margins flat to up, year-over-year. ***I'm just curious, what gives you the confidence that gross margins will get back to flat, given the fact there will still be early in some of these large programs?***

**Nielsen:**
So Adam, if you remember, Drew's comments and Drew can amplify on this, are talking about absorption, right? ***We are incurring some costs in the January quarter that we think we get the benefit of as revenue returns, at least in line and possibly growth.***

25.    The statements referenced in ¶¶ 19-24 were materially false and misleading because

Defendants made false and/or misleading statements, as well as failed to disclose material adverse

facts about the Company's business, operational and compliance policies. Specifically, Defendants

made false and/or misleading statements and/or failed to disclose that: (i) the Company was highly

dependent on permitting and tactical considerations for its large projects; (ii) the Company's

permitting for its large projects was uncertain; (iii) as a result, the Company was exposed to near-

term margin pressure and absorption issues; and (iv) as a result, the Company's public statements

were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

26.    The truth began to emerge on May 22, 2018, when Dycom issued a press release, attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the Company's financial and operating results for the first fiscal quarter ended April 28, 2018 ("Q1 2019 Press Release") and revising the guidance for the fiscal year 2019. The Q1 2019 Press Release stated in relevant part:

**Outlook**

*The Company is revising its financial guidance for the 2019 fiscal year ending January 26, 2019 to reflect the actual results for the quarter ended April 28, 2018 and the anticipated timing of activity on large customer programs and the related impacts on revenues and margins.* The Company's previous guidance and its current expectations for fiscal 2019 are as follows:

|  | Previous Guidance Fiscal 2019* | Revised Guidance Fiscal 2019 |
|---|---|---|
| Contract revenues | $3.30 - $3.50 | $3.23 - $3.43 |
| Diluted Earnings per Common Share - GAAP | $4.78 - $5.70 | $3.81 - $4.70 |
| Non-GAAP Adjusted Diluted Earnings per Common Share | $5.22 - $6.14 | $4.26 - $5.15 |
| Non-GAAP Adjusted EBITDA % of revenue | 13.6% - 14.1% | 12.4% - 12.9% |

*For a reconciliation of the prior Fiscal 2019 Diluted Earnings per Common Share guidance to the prior Non-GAAP Adjusted Diluted Earnings per Common Share guidance and a reconciliation of the prior Fiscal 2019 Net income guidance to the prior Non-GAAP Adjusted

27.    The Company held a conference call to discuss its financial and operating results for the first fiscal quarter ended April 28, 2018, during which Defendant DeFerrari stated, in relevant part:

Adjusted EBITDA was $73.7 million in Q1 2019, which was at 10.1% of revenue. Gross margins were at 18% and compared to the April quarter last year were

impacted by prolonged winter weather conditions and ***costs incurred on large customer programs***.

Gross margins were approximately 100 basis points below our expectations for the quarter. ***This margin pressure resulted from the under-absorption of labor and field costs as large customer programs mobilized. We expect margins to continue to be impacted in the near term with the pressure dissipating as we gain greater momentum on these large programs***. Accordingly, our outlook has been lowered for the full fiscal year from our prior expectations to reflect the expected margin pressure.

28.     Later on the conference call Defendant Nielsen responded to an analyst's question

concerning the Company's below-expectation financial results, stating, in relevant part:

**Stephens, Inc.:**

***So, Steve, obviously, the big question on everyone's mind this morning is the pressure on margin and a little more specifics around what's causing it***. And it sounds like you're still expecting a big ramp in the business. The timing has maybe changed a little bit. But I think what we're all trying to get at is a little more specific around the near-term margin pressure and do you believe you can still get this business back to a mid-teens EBITDA margin once things ramp up and you're better absorbing those costs?

**Nielsen**:

So, to the second question, Matt, yes. I mean, we have not changed our view on mid-teens EBITDA. ***With respect to the pressure on the business, we have a number of large programs, some of which require extensive permitting and other governmental authorities.*** While we've been through this before, the timing of when you build up a cadence in that process that will allow you to efficiently deploy resources, it's hard to forecast. I mean, we understand that and we're disappointed that we didn't get it as right as we would have liked last quarter. But that doesn't change that the projects are there, that we're confident in our ability to execute. ***We've just got to get enough work in hand so that we can both absorb the fixed cost around warehousing and supervision and general management as well as be efficient in the field as we get more permitted backlog that we can really go to work on.*** And it's getting better every day. It's just not getting better as quickly as we would have hoped 91 days ago.

**Stephens, Inc.:**

So, is this customer shifting the timing of work or is it simply the permitting process?

**Nielsen**:

We're all working together with our customers, with the permitting authorities. These are large programs. ***In fact, I think they are substantial programs and that means there is a substantial buildup in activities from the permitting authorities and it's taking a little time, but it's getting better.***

29.     Defendant Nielsen further revealed on the conference call that he had full knowledge of said uncertainties' impact on permitting issues because they were "always around starting the process." Nielsen then stated that the Company "had similar experiences with large programs 15 years ago" and was "still at them."

30.     On this news, the price of the Company's common stock declined $23.56 from a close on May 21, 2018 at $116.20 per share, to close at $92.64 per share on May 22, 2018, a decline of approximately 20.27%.

31.     Then, on August 13, 2018, Dycom issued a press release, attached as exhibit 99.1 to the Form 8-K filed with the SEC, revising the Company's guidance for the financial and operating results for the second fiscal quarter and six months ended July 28, 2018 and announcing preliminary revenues and results for the second quarter below the previous guidance ("Q2 2019 Guidance Press Release").

32.     The Company held a conference call to discuss the preliminary results, during which Defendant Nielsen highlighted the Company's absorption issues caused by the uncertainties related to permitting issues as the cause for its disappointing results, stating, in relevant part:

This morning, we reported preliminary results for the second quarter that were below our prior expectations. Revenue is expected to be approximately $799.5 million with Adjusted Diluted Earnings per Share, expected to range from a $1.05 to $1.08. This range includes approximately $0.9 million of incremental tax benefits. ***These preliminary results were impacted by large scale deployments that were slower than expected during the quarter, due to customer timing and tactical considerations and margins that were pressured from under-absorption of labor and field costs to the lower revenue level.***

33.     Later on the call, Defendant Nielsen was asked about permitting and absorption issues, and he responded by disclosing that the large projects were not ramping-up as expected due

to uncertainties related to permitting issues and that Dycom's core business was in reality not as busy as previously disclosed, stating, in relevant part:

**B. Riley FBR, Inc.:**

Steve, your comment with regards to tactical considerations primarily permitting, can you expand upon that just a little bit as it relates to how this tactical consideration due to permitting maybe is different than maybe past FiOS builds or fiber builds in the mid-2000s?

**Nielsen:**

Yeah, I think Alex as we said in May, these are big programs, they're ramping up broadly, they're subject to greater uncertainties and those are the uncertainties that impacted the second quarter. I mean they will resolve, but there are uncertainties because of the size of the programs.

**B. Riley FBR, Inc.:**

And then as it relates to cost pressures in the short-term, can you expand upon that a little bit too? And maybe address sort of your thinking on head count in the short-term, do you carry head count in anticipation of the big backlog and how that could come through next year? Just a little bit more detail would be helpful?

**Nielsen:**

Sure. So, I think as we said in the comments, it's really an absorption question. ***I mean we have to have the staff in place to support the revenue that's embedded in the guidance and we do, but we're not as busy as we had expected to be and so that create an absorption question.*** But because the work is there we have to have the people.

34.    On this news, the price of the Company's common stock declined $21.62 from a close on August 10, 2018 at $89.71 per share of Dycom common stock, to a close on August 13, 2018 at $68.09 per share of Dycom common stock, a decline of approximately 24.10%.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

35.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Dycom securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein,

the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Dycom securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Dycom or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- •     whether the federal securities laws were violated by Defendants' acts as alleged herein;
- •     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Dycom;

- whether the Individual Defendants caused Dycom to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Dycom securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

40.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

41.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Dycom  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Dycom securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

14

42.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

43.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

44.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

45.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

46.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Dycom securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Dycom

securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

47.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Dycom securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Dycom finances and business prospects.

48.     By virtue of their positions at Dycom , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

49.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Dycom, the Individual Defendants had knowledge of the details of Dycom internal affairs.

16

50.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Dycom.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Dycom businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Dycom securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Dycom business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Dycom securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

51.     During the Class Period, Dycom securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Dycom securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Dycom securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of Dycom securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

52.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

54.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

55.     During the Class Period, the Individual Defendants participated in the operation and management of Dycom, and conducted and participated, directly and indirectly, in the conduct of Dycom business affairs.  Because of their senior positions, they knew the adverse non-public information about Dycom misstatement of income and expenses and false financial statements.

56.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Dycom financial condition and results of operations, and to correct promptly any public statements issued by Dycom which had become materially false or misleading.

57.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Dycom disseminated in the marketplace during the Class Period concerning

Dycom results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Dycom to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Dycom within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Dycom securities.

58.    Each of the Individual Defendants, therefore, acted as a controlling person of Dycom.  By reason of their senior management positions and/or being directors of Dycom, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Dycom to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Dycom and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

59.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Dycom.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

19

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

DATED:  October 30, 2018                    Respectfully submitted,

Hedin Hall llp

By: /s/ Frank S. Hedin
             Frank S. Hedin

FRANK S. HEDIN (FBN 109698)
1395 Brickell Ave, Suite 900
Miami, Florida 33131
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
E-mail: fhedin@hedinhall.com

POMERANTZ LLP
Jeremy A. Lieberman*
J. Alexander Hood II*
Jonathan Lindenfeld  *
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
       ahood@pomlaw.com
       jlindenfeld@pomlaw.com

HOLZER & HOLZER, LLC
Corey D. Holzer*
Marshall P. Dees*
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com
       mdees@holzerlaw.com

* *Pro Hac Vice* Application Forthcoming

*Attorneys for Plaintiff*

DocuSign Envelope ID: 00CE3C59-24FB-4510-8DD3-3D1923E3F1B6

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| DY | 05/24/2018 | 5 | $91.36 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| DY | | | |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

None

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___26___ day of ___October___, 2018 in ___Bridgewater___, ___Massachusetts___.

City                    State

(Signature) X _____

_Evan Possick_

E771FD1CF153421...

(Print Name) _____Evan Possick_____

**Dycom Industries, Inc. (DY)**                                              **Possick, Evan**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 5/24/2018 | Purchase | 5 | $91.3600 |